## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINA

DAVID HAMILTON, derivatively on behalf of Altria Group, Inc.

      Plaintiff,

        v.

WILLIAM GIFFORD, JR., HOWARD A. WILLARD III, KEVIN C. CROSTHWAITE, JR., JOHN T. CASTEEN III, DINYAR S. DEVITRE, THOMAS F. FARRELL II, DEBRA J. KELLEY-ENNIS, W. LEO KIELY III, KATHRYN B. MCQUADE, GEORGE MUNOZ, MARK E. NEWMAN, NABIL Y. SAKKAB, VIRGINIA E. SHANKS, ADAM BOWEN, JAMES MONSEES, KEVIN BURNS, RIAZ VALANI, NICHOLAS J. PRITZER, AND JUUL LABS, INC.

      Defendants.

- and –

ALTRIA GROUP, INC., a Virginia Corporation,

      Nominal Defendant.

Case No. ___21- 47_____

JURY TRIAL DEMANDED

## VERIFIED SHAREHODLER DERIVATIVE COMPLAINT

Plaintiff David Hamilton ("Plaintiff"), on behalf of nominal defendant Altria Group, Inc. ("Altria"), brings the following Verified Stockholder Derivative Complaint (the "Complaint") against certain members of the board of directors of Altria and/or Altria officers (collectively, the "Altria Defendants"), for breaching their fiduciary duties. Plaintiff also brings this complaint against certain members of the board of directors of JUUL Labs, Inc. ("JUUL") and/or JUUL officers (collectively, the "JUUL Defendants," and together with the Altria Defendants, "Defendants") for aiding and abetting the Altria Defendants' breaches of fiduciary duties. The allegations of the Complaint are based on the knowledge of Plaintiff as to himself, information

1

uncovered during the course of the investigation made by Plaintiff's counsel, which included among other things, the review of publicly available information, including press releases, conference call transcripts, filings made with the United States Securities and Exchange Commission (the "SEC"), news articles, websites, and other sources.

**NATURE OF THE ACTION**

1.      Altria is one of the world's largest tobacco companies. This shareholder derivative action arises out Altria's disastrous equity investment in JUUL, an electronic cigarette company, in late 2018. As alleged herein, the Altria Defendants caused Altria to invest $12.8 billion in JUUL, only to see this massive investment plunge in value in less than a year, as JUUL became embroiled in potentially ruinous civil litigation and state and federal regulatory crackdowns due to health dangers posed by JUUL's products and its targeting of underage users. These were risks the Altria Defendants knew about at the time of Altria's investment in JUUL, yet recklessly ignored, with extremely dire consequences for Altria and shareholder value.

2.      Altria grew into the massive tobacco company it is today in large part through controversial practices such targeting teenagers in its marketing. Altria pioneered marketing strategies—both overt and covert—to persuade new smokers to take up the habit. Over time, Altria's wrongful conduct resulted in a backlash. Consumers became more savvy to the marketing techniques of Altria and other tobacco companies. More significantly, state and federal regulators intervened, imposing increasingly substantial restrictions on Altria's ability to market to new smokers, including teenagers. Public health campaigns were effective in convincing young people to avoid tobacco products.

3.      Teenage smoking rates in the United States plummeted beginning in the 1990s and continued dropping in the 2000s and early 2010s, leading to a substantial, continual decline in Altria's United States sales. Altria was, in part, able to offset the loss in sales by expanding its

sales abroad, but this was only a temporary fix, as other countries around the world followed in the footsteps in the United States in taking regulatory measures and engaging in public health campaigns to cut off Altria and other tobacco companies from targeting new, young addicts.

4.     Faced with this decline, Altria in the mid-2010s encountered a new, substantial risk to its traditional combustible cigarette business: the emergence of e-cigarettes—electronic devices that simulate tobacco smoking but that deliver nicotine through a water vapor rather than smoke. E-cigarettes were marketed as a safer alternative to combustible cigarettes.

5.     One key advantage that new e-cigarette makers had over traditional tobacco companies was that they were unconstrained by both the history and regulatory consequences of the tobacco companies' historical marketing to youth. Tobacco companies were subject to strict oversight and regulation that prohibited them not only from marketing to youth but also from a broad range of marketing activities that could be perceived as attractive to youth specifically or new smokers more generally.

6.     Most notable among these were restrictions Altria and other tobacco companies agreed to through the November 1998 Master Settlement Agreement reached among tobacco companies, state attorneys general of 48 states, and the District of Columbia, which substantially restricted Altria's marketing and promotion of cigarettes. Because they were not subject to these constraints, e-cigarette companies were able to adopt many of the marketing strategies traditional tobacco companies had pioneered but had since been forced to abandon.

7.     Among numerous e-cigarette companies, a leader emerged. JUUL created a unique product that packaged nicotine salts from tobacco into one-time use cartridges called "pods." JUUL quickly became the most popular e-cigarette in the United States. One of the major drivers of JUUL's popularity was its ability to target youth in a way that traditional tobacco companies

could not. Most notably, JUUL used flavored pods to draw children into vaping (flavored combustible cigarettes had been banned), and JUUL engaged in marketing strategies designed to attract youth. JUUL's efforts were successful, leading toward broad adoption of the product by teenagers. With these strategies, JUUL achieved an outcome that just years prior seemed unimaginable, given the trends in youth smoking: JUUL cultivated a generation of brand-loyal, addicted, teenage customers.

8.      Altria responded to these developments initially by itself attempting to enter the e-cigarette business. In 2013, its subsidiary, Nu Mark, launched the MarkTen e-cigarette. Altria was able to leverage its existing distribution infrastructure to make MarkTen one of the most popular e-cigarette brands, but Altria was nonetheless constrained by the restrictions imposed upon it by the Master Settlement Agreement and the close supervision and scrutiny to which it was subject as a result of its prior conduct.

9.      JUUL, in contrast, emerged as the front-runner in the e-cigarette market. Unconstrained by the same restrictions and scrutiny as traditional tobacco companies, JUUL marketed directly to youth and actively solicited new, young e-smokers. It grew rapidly in popularity among teenagers. By 2018, it had a 76% market share in the e-cigarette business.

10.     The Altria Defendants knew that JUUL was a ticking time bomb—that it was only a matter of time before JUUL faced the same public backlash and regulatory scrutiny as tobacco companies. They knew that public and regulatory reaction would come much more quickly than the reaction traditional tobacco companies faced, which took decades to fully envelop the tobacco industry. Instead, the reaction against JUUL would come over the course of only a few years, and more likely, months as the public and governments came to understand JUUL's improper marketing and negative health impact.

11.     Even before Altria's investment in JUUL, the U.S. Food and Drug Administration ("FDA") had repeatedly made statements—often specifically referencing JUUL—that there existed an "epidemic" of youth usage of e-cigarettes that would require regulatory attention. State attorneys general had launched investigations, echoing the investigations and litigation decades before that ultimately led to the Master Settlement Agreement.

12.     Despite these red flags, Altria invested in JUUL, agreeing to pay $12.8 billion in cash (obtained through debt) to obtain a 35% stake in JUUL, which implied a valuation for JUUL of $38 billion, more than double its valuation just five months prior, notwithstanding that during those five months, the prospects for restrictive regulation of JUUL's business were growing rapidly.

13.     Through the JUUL agreement, Altria became more than an investor but also an active participant in JUUL's unlawful marketing to underage consumers and deceptive marketing concerning the benefits of JUUL's products. Altria committed itself to provide support to JUUL in its marketing and distribution of JUUL's products.

14.     Bolstering the reckless impropriety of Altria's investment in JUUL was Altria's capitulation to an anticompetitive demand made by JUUL: that before Altria could invest in JUUL, Altria had to withdraw its competing e-cigarette products and agree not to compete in the future. At the time JUUL was making this demand, Altria and JUUL were the top two participants in the e-cigarette market; JUUL's demand contemplated an agreement among those top two competitors not to compete. Altria and JUUL knew full well that this agreement not to compete would draw a swift backlash from competition regulators upon its discovery, exposing Altria to only further losses.

15.     Shortly after Altria announced the investment in early 2019, the regulatory and public backlash against JUUL intensified, as anticipated. The FDA reiterated the inevitability of regulation that would dramatically curtail JUUL's business model. State attorneys general launched complaints that further threatened JUUL's business. The risks from targeting children for addictive nicotine products materialized, as a wave of lung illness and deaths from e-cigarette use spread across the country in the summer and fall of 2019, making severe regulation of the e-cigarette industry even more imminent.

16.     In light of these major blows to JUUL's value, Altria had no choice but to repeatedly write down its JUUL investment, first on October 31, 2019 by $4.5 billion, then again just two months later on January 3, 2020 by another $4.1 billion.

17.     Aside from the lost value of its investment in JUUL, Altria itself came under fire for its participation in wrongdoing, being named as a defendant in massive consumer class actions (consolidated in an MDL in the U.S. District Court for the Northern District of California, the "Consumer Class Action"), and securities fraud class actions. The U.S. Federal Trade Commission ("FTC") also brought an action against JUUL and Altria after the FTC realized the anticompetitive terms of the JUUL agreement. Altria's exposure to massive liability to plaintiffs in various lawsuits and professional expenses for defending against hundreds of private and government lawsuits has inflicted and will continue to inflict serious losses upon Altria that were avoidable.

18.     These losses and anticipated future losses caused Altria to lose nearly $50 billion in market capitalization, or $26.35 per share between April 2019 and March 2020.

19.     The Altria Defendants breached their fiduciary duties to Altria by (a) causing Altria to enter in an investment for which it dramatically overpaid, notwithstanding information in Altria's possession showing that JUUL's business was in imminent danger of public backlash,

regulation, and litigation that could cripple its value going forward; (b) causing Altria to enter into anticompetitive agreements with JUUL that would inevitably result in antitrust claims being brought both against Altria and JUUL; (c) causing Altria to participate in JUUL's unlawful marketing to underage consumers and deceptive marketing of its product as being a harm reduction device when, in fact, as Altria knew at the time of the investment, JUUL's products were designed to draw in new nicotine addicts, not reduce the harm experienced by existing addicts; (d) causing Altria to issue false and misleading statements to investors about the benefits of Altria's investment in JUUL, thus exposing Altria to substantial liabilities for securities fraud when the JUUL investment went south; and (e) wasting Altria's corporate assets by making an improvident investment that not only overvalued JUUL but also required Altria to incur substantial debt.

### JURISDICTION AND VENUE

20.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and cost.

21.     This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business and maintains operations in this District, or is an individual who has sufficient minimum contacts with this jurisdiction so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and Altria conducts business in and maintains executive offices in this District.

23.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

**THE PARTIES**

24.     Plaintiff David Hamilton is a current stockholder of Altria. Plaintiff has continuously owned shares of Altria since 2016. Plaintiff is a citizen of Allentown, Pennsylvania.

25.     Nominal defendant Altria is a company focused on selling tobacco products through various subsidiaries and investment agreements. Altria is incorporated in the Commonwealth of Virginia and has its corporate headquarters in Richmond, Virginia. Altria's common stock trades on the NYSE under the ticker symbol "MO."

26.     Defendant William F. Gifford, Jr. is Chief Executive Officer of Altria and has held that position since April 16, 2020. Before that, he was Vice Chairman and Chief Financial Officer since May 2018, where he was responsible for Altria's core tobacco business, sales and distribution business, and Altria's Consumer & Market Insight team. Before that, he served as Executive Vice President and Chief Financial Officer from March 1, 2015 to May 2018. Before that, he served in various leadership rules at Phillip Morris USA, including as President and Chief Executive Officer. He has also been a board member of Altria from May 2020 to the present. Mr. Gifford is a citizen of Virginia.

27.     Defendant Howard A. Willard III was Chairman and CEO of Altria from May 2018 until April of 2020. Before that he was Chief Operating Officer of Altria from March 2015 through May 2018. Before that, he was an Executive Vice President and CFO of Altria from January 2011 through March 2015. Prior to March 2015, he held various positions in Altria and Philip Morris USA Inc. He was also a board member for Altria from February 2018 until May 2018, and again became a board member in 2020. Mr. Willard is a citizen of Virginia.

28.     Defendant Kevin C. Crosthwaite, Jr. is the current Chief Executive Officer of JUUL and has held that position since September 2019. Before that, he served as Senior Vice President/Chief Strategy & Growth Officer for Altria form June 2018 until September 2019. Before that, he served as President and CEO of Philip Morris, Inc. from June 2017 until June 2018. Before that, he held various high-level positions at Philip Morris and other Altria subsidiaries since 1997. He has also served as a member of JUUL's board since July 2020. Mr. Crosthwaite is a citizen of Virginia.

29.     Defendant John T. Casteen III is and has been a board member of Altria since 2010. He is a member of the Audit, Compensation, Talent Development and Innovation Committees. Mr. Casteen is a citizen of Virginia.

30.     Defendant Dinyar S. Devitre is and has been a board member of Altria since January 2008. He is Chair of the Finance Committee and a member of the Executive, Innovation and Nominating, Corporate Governance and Social Responsibility Committees. He also previously worked for both Altria and Philip Morris, holding various senior-level positions from 1970 through 2008. Mr. Devitre is a citizen of New York.

31.     Defendant Thomas F. Farrell II is and has been a board member of Altria since 2008. He is the Non-Executive Chairman of the Board, Chair of the Executive Committee, and a member of the Compensation and Talent Development and Nominating, Corporate Governance, and Social Responsibility Committees.  Mr. Farrell is a citizen of Virginia.

32.     Defendant Debra J. Kelley-Ennis is and has been a board member of Altria since 2013. She is a member of the Audit, Innovation and Nominating, Corporate Governance, and Social Responsibility Committees. Ms. Kelley-Ennis is a citizen of Canada.

33.     Defendant W. Leo Kiely III is and has been a board member of Altria since 2011. He is Chair of the Compensation and Talent Development Committee and a member of the Executive Finance and Innovation Committees. Mr. Kiely is a citizen of Illinois.

34.     Defendant Kathryn B. McQuade is and has been a board member of Altria since 2011. She is Chair of the Nominating, Corporate Governance and Social Responsibility Committee and a member of the Audit, Compensation and Talent Development and Executive Committees. Ms. McQuade is a citizen of Nevada.

35.     Defendant George Muñoz is and has been a board member of Altria since 2004. He is Chair of the Audit Committee and a member of the Executive, Finance and Nominating, Corporate Governance and Social Responsibility Committees. Mr. Munoz is a citizen of Illinois.

36.     Defendant Mark E. Newman is and has been a member of the Altria board since 2018. He is a member of the Audit, Finance and Innovation Committees. Mr. Newman is a citizen of Delaware.

37.     Defendant Nabil Y. Sakkab is and has been a member of the Altria board since 2008. He is Chair of the Innovation Committee and a member of the Executive, Finance and Nominating, Corporate Governance and Social Responsibility Committees. Mr. Sakkab is a citizen of Nevada.

38.     Defendant Virginia E. Shanks is and has been a member of the Altria board since 2017. She a member of the Audit, Compensation and Talent Development and Innovation Committees. Ms. Shanks is a citizen of Nevada.

39.     This complaint refers to defendants Gifford, Willard, Crosthwaite, Casteen, Devitre, Farrell, Kelley-Ennis, Kiely, McQuade, Muñoz, Newman, Sakkab, and Shanks as the "Altria Defendants."

40.     Defendant Adam Bowen is a co-founder and Chief Technology Officer of JUUL. He has held the position of Chief Technology Officer at JUUL and its predecessor company, PAX Labs Inc., since 2007. He is also a member of JUUL's board since its inception and has been Chairman of JUUL's board since January 2019. Mr. Bowen is a citizen of California.

41.     Defendant James Monsees is a co-founder of JUUL. He was Chief Product Officer at JUUL and its predecessor company PAX Labs Inc. from September 2015 until October 2019. Since October 2019, he has served as an Adviser to JUUL. Mr. Monsees is a citizen of California.

42.     Defendant Kevin Burns was the Chief Executive Officer of JUUL from December 2017 until September 2019. Mr. Burns is a citizen of California.

43.     Defendant Riaz Valani is and has been a director of JUUL since May 2011. Although he is not an employee of JUUL, Valani was actively involved in JUUL's business, and as described below, had direct involvement in the negotiation of transactions with Altria from which the claims asserted in this complaint arise. Mr. Valani is a citizen of California.

44.     Defendant Nicholas J. Pritzker is and has been a director of JUUL since May April 2015. Although he is not an employee of JUUL, he was actively involved in JUUL's business, and as described below, had direct involvement in the negotiation of transactions with Altria from which the claims asserted in this complaint arise. Mr. Pritzker is a citizen of California.

45.     This complaint refers to Defendants Bowen, Monsees, Burns, Valani, and Pritzker as the "JUUL Defendants."

46.     Defendant JUUL is a Delaware corporation with its principal place of business in Washington, D.C. JUUL is an electronic cigarette company which packages nicotine salts from leaf tobacco into one-time use cartridges.

FACTUAL ALLEGATIONS

**I.      Altria Knew of Risks Inherent in JUUL Based on Its Own Prior Business Practices.**

47.     The history of Altria's and its subsidiaries'—most notably Philip Morris's—targeting of underage consumers and its decades-long deception about cigarette safety is well documented. Plaintiff presents a brief overview of that history here not to brand Altria's as a bad actor; instead, the purpose of the overview below is to demonstrate a simple fact: when Altria entered its investment with JUUL, it knew full well the serious, imminent risks JUUL faced due to its marketing to underage consumers and deception relating to the safety of its e-cigarettes.

48.     The Altria Defendants knew the risk because Altria had, itself, pioneered the exact same scheme with respect to combustible cigarettes. The backlash JUUL faced shortly after Altria's investment could have been no surprise to the Altria Defendants—many of whom are industry veterans familiar fully with the public perception, regulatory, and litigation risk faced by building a company from marketing to underage consumers and deceiving consumers about the risk of a product designed to procure nicotine addiction.

A.      *Altria Builds a Business Empire Based on Targeting Young Smokers.*

49.     Internal Philip Morris documents that have become public as a result of litigation reveal that Philip Morris's explosive growth in the middle part of the last century was driven by its intentional strategy of cultivating new teenage smokers. A host of such documents provide a glimpse into Philip Morris's strategies of targeting youth. A small sample of the voluminous evidence of these strategies follows.

50.     Philip Morris conducted extensive research into youth smoking behavior to inform its marketing strategy. In the 1960s, Philip Morris commissioned studies examining the smoking habits of teenagers as young as 12 or 13 years old. A 1963 study examined the brands smoked by teenagers aged 13–18, how much they smoked, what prompted them to begin smoking, and how

often they purchased cigarettes from vending machines. A 1973 internal memorandum discussed the results of a survey aimed at youths between 12–17 years old seeking to identify how and why such youths purchased cigarettes.

51.     Philip Morris itself recognized, internally, that its growth as a company was fueled by its efforts to market to teens. A May 1975 internal Philip Morris memorandum explained: "Marlboro's phenomenal growth rate in the past has been attributable in large part to our high market penetration among young smokers…15 to 19 years old… [M]y own data, which includes younger teenagers, shows even higher Marlboro market penetration among 15-17 year-olds."

52.     Another 1981 memo explained that Philip Morris's success stemmed from its ability to hook teenagers at an early age while cultivating brand loyalty which, when combined with addictive nicotine, would ensure long-term customers. The memo explained: "the success of Marlboro Red during its most rapid growth period was because it became *the* brand of choice among teenagers who then stuck with it as they grew older."

53.     This "phenomenal growth" was no accident but was instead the product of a concerted business strategy. Philip Morris acknowledged in an internal 1992 memorandum: "[T]he ability to attract new smokers and develop them into a young adult franchise is key to brand development."

54.     Another internal document underscored that the key to Philip Morris's continued success was to recruit new, young smokers to its brand: "[To support Marlboro's growth, Marlboro must] continue growth among new, young smokers…. While Marlboro continues to attract increasing shares of young smokers, expected declines in the number of young people restrict future volume gains from this source."

55.     Long before JUUL adopted the strategy of marketing its products directly to high-school students (as described below), Philip Morris invented that strategy decades prior. Philip Morris touted internally efforts to sell its Marlboro cigarettes through retail locations close to high schools, exclaiming in an internal March 1998 document: "Sales—Outstanding! Outstanding! Outstanding! … This account is located 2 blocks from Bellingham High School. Our pre-sell has sold through. The account had reordered and received more product."

56.     Philip Morris was aware of how reductions in teenage smoking would cause a particularly negative impact on Philip Morris compared to other tobacco companies, because Philip Morris had a high portion of youth customers. In a 1981 internal memo, Philip Morris acknowledged: "Because of our high share of the market among the youngest smokers, Philip Morris will suffer more than the other companies from the decline in the number of teenage smokers."

B.     *Altria Expands Its Tobacco Empire by Obfuscating the Health Risks of Cigarettes.*

57.     Altria, through its subsidiary, Philip Morris, both preserved and expanded its dominant market position in cigarettes by actively deceiving consumers about the health risks of cigarettes and, later, by touting so-called "light" cigarettes as a safer alternative to regular cigarettes. Altria's marketing provided a blueprint for JUUL's marketing strategy—to deceive consumers into believing that its product was safe or even beneficial.

58.     By the 1950s, the link between cigarettes and lung cancer had become firmly established among medical researchers. But there was uncertainty among the consuming public as to the link, particularly among addicted smokers who sought to rationalize their self-harming behavior by downplaying the harm. While smokers were hearing from public health experts about the cancer risk from smoking, they also heard from sources in the tobacco industry that smoking

14

was safe. Popular sports figures, movie stars, and other high-profile personalities appeared in thousands of cheery tobacco ads that made no reference to any hazard.

59.     Philip Morris and other tobacco companies countered the growing public health concern about smoking in several ways. For example, Philip Morris and other tobacco companies employed doctors to advertise that cigarettes were helpful to "soothe the throat" or "aid digestion" or "keep you alert."

60.     The industry stopped making explicit health claims in the 1950s, following a decade of governmental investigations in which the industry was charged with false advertising. But even without making explicit health claims, the tobacco industry, Philip Morris included, continued to fight back against the cancer scare with an aggressive, coordinated campaign of deceit.

61.     In 1953, the nation's largest tobacco companies met in New York and coordinated to issue the infamous "Frank Statement to Cigarette Smokers," published in newspapers through the country. The "Frank Statement" claimed that its consumers' health was "paramount to every other consideration in our business" and that claims that cigarettes lead to death had been abandoned "one by one" for lack of evidence. This was an outright lie; claims relating to the health risks of cigarettes had not been abandoned but had instead accumulated steadily.

62.     Philip Morris, together with other tobacco companies, formed the Tobacco Industry Research Committee ("TIRC") to undermine the evidence accumulating in the public health community about the dangers of cigarettes. A 1962 TIRC press release claimed that "the causes of lung cancer are not known to science," and a 1978 booklet reasserted that "years of scientific research" had "failed to provide conclusive evidence that smoking causes disease."

63.     Altria and its affiliates were direct participants in concealing and downplaying the harmful effects of cigarettes. In 1971, for example, when the British Research Council found that

babies born to smoking mothers had higher mortality rates and were significantly underweight, Philip Morris' President and CEO, Joseph F. Cullman, III, responded on "Face the Nation," a popular national television program, that "we do not believe that cigarettes are hazardous" and that in any event, perhaps "some women would prefer having smaller babies."

64.     One important lesson from Philip Morris' history of deceiving the consuming public is that nicotine companies' public statements about the risks or benefits of their products often bear little relationship to their actual understanding of those risks and benefits. At the same time it was publicly questioning and denying the harmful nature of cigarettes, an internal Philip Morris document in 1966, marked as "Not to be taken from this room," concluded that "gross lung pathology can be induced by smoking cigarettes."

65.     Along the same lines, at the same time Philip Morris was denying publicly that cigarettes caused cancer, an internal 1961 Philip Morris report listed 40 separate carcinogens in cigarette smoke and a dozen additional "tumor promoting agents."

66.     As the tobacco industry began to lose the battle of public opinion regarding the safety of cigarettes, Philip Morris tried a new strategy: making and promoting a type of cigarette as a safer alternative to "regular" cigarettes. Philip Morris's strategy directly foreshadowed JUUL's business model decades later: attempting to convince smokers that one addictive nicotine product was a safer alternative compared to other nicotine products.

67.     As Philip Morris began to develop a cigarette it could market as safer, however, it recognized one fact: the nicotine content of the cigarettes must be kept high because if nicotine levels fell below a threshold, people might begin to quit. Philip Morris's internal documents recognized that nicotine levels "should be 0.7 mg minimum" to keep smokers hooked.

68.     Philip Morris achieved this goal in a dishonest fashion, by designing cigarettes that had a lower tar and nicotine yield when measured by robotic smoking machines, but that delivered the same tar and nicotine yield when smoked by a human, who would engage in "compensation" in order to achieve the same degree of nicotine fix (methods of "compensation" included, for example, puffing the cigarette more forcefully). Put another way, faced with a cigarette that delivers less nicotine, users will unconscionably "compensate" by adjusting their smoking habits to obtain the same nicotine delivery. This strategy too provided a blueprint for JUUL, which as discussed more fully below, would design its pod-based cigarette intentionally to maximize delivery of nicotine to cause the user to become addicted.

69.     Philip Morris was fully aware of this phenomenon. As one internal Philip Morris document put: "People do not smoke like the machine…people smoke in such a way that they get much more than predicted by the machine." Another internal document, prepared shortly before Philip Morris began selling "light" cigarettes, explained: "[I]t is the pharmacological effect of the inhaled some which mediates the smoking habit… We have then as our first premise that the primary motivation for smoking is to obtain the pharmacological effect of nicotine."

70.     Recognizing smokers were increasingly concerned about their health, Philip Morris developed, and later started selling, "light" cigarettes. Philip Morris's "light" cigarettes previewed the same marketing strategy JUUL would use decades later: seeking to keep consumers addicted to its product through promises of a healthier nicotine delivery system. Philip Morris started selling "Marlboro Lights" in 1972.

71.     Philip Morris, much like JUUL later, did not make explicit health claims but instead relied on product labels such as "lowered tar and nicotine" and "light" to communicate, indirectly, that health message. A 1980 internal Philip Morris document, for example, explained "implicit in

17

the tobacco industry's promotion of the low delivery cigarettes is the assumption that less tar and less nicotine represent a safer cigarette."

72.     Consumers broadly understood the message. Consumers who identified as "light smokers" were generally more concerned about their health, working under the assumption that light cigarettes were safer than regular cigarettes. A report commissioned by Philip Morris confirmed this consumer understanding, concluding: "The low tar brands have cornered opinion that to the extent any brands are better for your health, they are." Researchers in 1994 concluded that "the main reason for switching [to 'light' cigarettes] was perceived health."

73.     As explained above, however, this understanding was wrong, and Philip Morris knew it. In short, Philip Morris promoted a supposedly safer cigarette while knowing all along that light cigarettes were no safer than regular cigarettes.

## II.     Altria's Business Strategy of Targeting Young New Smokers Is Thwarted by Public Backlash, Regulation, and Litigation.

74.     It was not until the late 1990s that tobacco industry executives finally began to admit publicly that smoking could even possibly cause cancer.

75.     At the time, Philip Morris and other tobacco companies had begun to face a tsunami of litigation, including both cases brought by smokers (and their surviving relatives) and by governments. The litigation focused both on Philip Morris's illegal marketing to underage smokers and its deception about the risks of cigarettes generally and the purported health benefits of light cigarettes.

76.     Philip Morris faced staggering liability for its wrongdoing, not to mention immense legal fees in defending against the seemingly endless parade of claims against it. Philip Morris was a defendant in tens of thousands of wrongful death lawsuits, which occasionally led to massive verdicts against it, not to mention the expense of defending against each lawsuit.

18

77.     Philip Morris was also subject to class action lawsuits relating to its deceptive marketing of cigarettes in many states, leading to decades of drawn out litigation and sometimes substantial judgments on behalf of deceived consumers.

78.     In addition to private litigation, lawsuits brought by attorneys general of 48 states led ultimately to the Master Settlement Agreement, entered in November 1998. That agreement required Philip Morris to produce millions of pages of internal documents from its files, which revealed the scope of its deception of the consumer public. It was also required to stop its denialist campaign with respect to addiction and the link between smoking and cancer.

79.     Perhaps most significantly, Philip Morris, through the Master Settlement Agreement, agreed to curtail or cease certain marketing practices, including not to "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco products, or to take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within ay Settling state." Philip Morris agreed to stop advertising on billboards, transit services, and at sporting and other entertainment events. Philip Morris agreed to make tens of billions of dollars in both up-front and continuing payments in connection with the settlement, which the states then used, among other things, to fund vigorous antismoking campaigns.

80.     The impact of these restrictions, together with increasing public knowledge about the dangers of cigarettes, was substantial. After peaking around 1980, cigarette consumption in the United States steadily declined in the ensuing decades, dropping by more than half by 2010 (from 631.5 billion cigarettes consumed in 1980 to 305 billion in 2010), and then continuing to decline during the 2010s.

81.     By 2014, teen smoking hit a record low—15.7%. The United States Surgeon General reported in 2014: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause. The good news is that we know which strategies work best. By applying these strategies more fully and aggressively, we can move closer to our goal of making the next generation tobacco-free."

82.     Philip Morris was able to offset this decline in sales in part by expanding sales outside of the United States, but over time, other countries have begun to follow in the footsteps of the United States by experiencing increasing public awareness of the dangers of smoking and imposing greater restrictions on tobacco companies' ability to target young new smokers. Accordingly, even before the emergence of e-cigarettes, Philip Morris faced perpetually declining revenues.

## III.     Altria's Business Faces a New Threat to Its Business: Unregulated E-Cigarettes.

83.     The concept of smokeless, non-tobacco cigarettes has been contemplated for decades, with the first patent relating to such a product dating back to 1967. The interest in such products accelerated in the 1990s and early 2000s, as the consuming public became more averse to traditional combustible cigarettes as a result of effective, global antismoking marketing campaigns.

84.     The first e-cigarettes available to consumers were released in Asia in 2004; companies began selling the products in the United States a few years later, in 2007.

85.     An e-cigarette consists of an atomizer, a power source such as a battery, and a container for the e-liquid such as a cartridge or tank. E-cigarettes create an aerosol, commonly called vapor, made of particulate matter, which contains, among other things, nicotine, flavors, and other particles.

86.     E-cigarettes, at the time they first went on sale, were largely unregulated. The FDA would not begin to assert meaningful regulatory authority over e-cigarettes until 2018, following press coverage of the emerging problems of underage use of e-cigarettes, which had begun to reverse the long-term trend of teenagers reducing their use of tobacco products.

87.     E-cigarette makers marketed the new products in two ways in particular that threatened the business of legacy tobacco companies. First, e-cigarette makers were able to market their products to young consumers in a way that tobacco companies could not, both because of regulations and other limitations imposed specifically upon Altria (including through the Master Settlement Agreement), and the bright spotlight under which tobacco companies operated as a result of their historical unlawful conduct in targeting young nicotine addicts. For example, e-cigarette makers could flavor e-cigarettes to taste like fruit and other sweet treats, which targeted new and young consumers. Most flavoring had long been banned for combustible cigarettes, putting such cigarettes at a competitive disadvantage to e-cigarettes.

88.     Second, e-cigarette makers marketed e-cigarettes as a healthier alternative to combustible cigarettes. Such marketing posed a direct threat to the market share of traditional tobacco companies such as Altria, given the public's growing concern over the health effects of cigarettes, which had already substantially cut into Altria's business. Such health-based marketing had two, distinct impacts on traditional cigarette companies: first, some current smokers of combustible cigarettes would switch to e-cigarettes; second, and perhaps more importantly, e-cigarette manufacturers used such health claims to seize the lion's share of new and young smokers, for whom health concerns played a much greater role in their buying decisions.

IV.     **Altria Enters the E-Cigarette Market and Competes Against JUUL.**

89.     By the mid-2010s, alternative nicotine products such as e-cigarettes had developed increased consumer interest, as smokers began to accept the dangers of smoking but still sought a

21

way to obtain the nicotine to which they were addicted. E-cigarettes emerged as the fastest-growing category of nicotine alternatives to smoking.

90.     Altria entered the e-cigarette market through its subsidiary NuMark in 2013. Over the next several years, it invested heavily in e-cigarette products, spending well over $100 million to acquire existing e-cigarette companies and tens of millions of dollars developing its own products. By mid-2017, Altria's MarkTen e-cigarette had achieved the second-highest market share among e-cigarettes.

91.     Altria management emphasized the importance of e-cigarettes to Altria's business during investor presentations. Defendant Willard, in February 2018, for example, explained "Nu Marks' goal is to lead the U.S. e-vapor category with a portfolio of superior, potentially reduced-risk products that…generate cigarette-like margins at scale."

92.     In February 2018, Altria introduced the MarkTen Elite, a pod-based e-cigarette that was very similar to JUUL's e-cigarette in appearance and design. Although JUUL continued to dominate the e-cigarette market, Altria told investors that its products were gaining against JUUL.

93.     Altria's e-cigarette products, and its MarkTen line in particular, were important strategically to Altria because they operated as a hedge to the reduction in combustible cigarette consumption due to health concerns about smoking. If Altria could become a leader in the market for e-cigarettes, then any reduction in consumption of combustible cigarettes would be a wash for Altria, or even a benefit if Altria could command a greater market share of the e-cigarette market than it possessed in the combustible cigarette market.

94.     Altria publicly described e-cigarettes as critical strategically to its future. Altria's former CEO, Martin Barrington, told investors: "So we'll be clear: We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products." Defendant Willard, along the same lines,

stated in an interview with the Wall Street Journal: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."

**V.    JUUL Surges in Popularity by Copying Tobacco Companies' Strategy of Targeting New, Underage Smokers.**

95.    JUUL was co-founded by defendants Adam Bowen and James Monsees. While graduate students at Stanford in 2005, Bowen and Monsees developed an e-cigarette called Ploom, and then started a company by the same name two years later in 2007.

96.    In 2015, the company sold Ploom, changed its name to PAX Labs. Juul Labs, Inc. was founded on May 22, 2015, and its electronic cigarette was first introduced in June 2015.

97.    Defendants Bowen and Monsees patterned their company after tobacco giants like Altria. Monsees, for example, has lauded the cigarette as "the most successful consumer product of all time…an amazing product." Monsees and Bowen formed JUUL's predecessor company to "deliver[] solutions that refresh the magic and luxury of the tobacco category."

98.    JUUL from the start designed its products to appeal to new, young users, rather than switching current smokers to the product. Internal reports reveal that a JUUL prototype developed in 2014 was "liked" by a "younger group" and "isn't going to fit as well with consumers who are looking to cut back on the cigarette intake."

99.    Although JUUL marketed its products as a beneficial device that could help smokers quit smoking, the truth was that JUUL designed its product to sustain nicotine addiction, not end it. JUUL scientists developed new e-liquids and devices to increase the amount of nicotine that e-cigarettes could deliver to users and reduce any irritation in the throat. Reducing the harshness of nicotine delivery allowed more frequent use of e-cigarettes compared to combustible cigarettes, masking the amount of nicotine being delivered. JUUL performed studies to identify

23

chemicals to use in its e-liquid solution to ensure that nicotine delivery was higher than combustible cigarettes. JUUL's internal research has been confirmed by external research revealing that JUUL delivers greater amounts of nicotine than combustible cigarettes.

100.    In July 2017, Juul Labs, Inc. was spun out of PAX Labs as an independent company. Co-founder Bowen worked as Chief Technology Officer, while co-founder Monsees worked as Chief Product Officer, and both served as board members. Other board members included defendant Pritzker, whose family owned the major chewing tobacco company, Conwood, and defendant Valani.

101.    According to an amended complaint filed in the Consumer Class Action, which drew upon internal JUUL documents obtained in discovery in that case, Pritzker and Valani formed an Executive Committee of the JUUL board that took charge of the fraudulent marketing of JUUL products, including to youth. That is, although they were not employees of the company, they took on personal, operational responsibility for JUUL's aggressive marketing campaign. Although other JUUL board members expressed concern that JUUL was marketing to youth, Pritzker and Valani overruled those directors and dismissed senior leaders at the company in order to press for even more aggressive marketing toward youth.

102.    JUUL e-cigarettes deliver an exceptionally high nicotine concentration, making the cigarettes highly addictive to individuals not accustomed to nicotine intake (in particular, teenagers and other new users). A JUUL internal study confirmed that although cigarettes deliver to the user only approximately 10% of the nicotine contained in a cigarette, JUUL pods can deliver nearly 100% of the nicotine in the liquid solution.

103.    JUUL, in public statements, disclaimed an interest in marketing its e-cigarettes to underage users and emphasized its intent to convert existing adult cigarette users to its products.

The company's 2018 mission statement specified that it was "dedicated to eliminating cigarettes by offering existing adult smokers with a better alternative to combustible cigarettes." Contrary to this claimed intention, a key factor contributing to JUUL's growth in sales has been its adoption by young customers.

104.    A 2018 survey indicated that teens ages 15–17 were more likely to use JUUL e-cigarettes then 25–34 year-olds. That survey indicated that 9.5% of teens aged 15–17 used JUUL, 11.2% of those aged 18–21 used JUUL, but only 3.2% of consumers aged 25–34 used JUUL. Although the survey did not address users age 35 and higher, it is broadly understood that older individuals are even less frequent JUUL users than 25–34 year-olds.

105.    JUUL e-cigarettes appeal to teenagers for multiple reasons. First, JUUL e-cigarettes are easy to hide from parents. The JUUL e-cigarette looks much like a USB thumb drive; an adult not familiar with JUUL may not recognize it as a nicotine delivery device even if the parent held one in their hand. Research published in a JAMA journal noted: "pod-based e-cigarettes [such as JUUL] use USB-shaped prefilled pods…. [T]he sleek, small and 'high -tech' look of pod-based e-cigarettes makes it easy to hide the e-cigarettes in one's hand and may not appear at first glance, or to those unfamiliar with the design, to even be an e-cigarette."

106.    Second, during its period of explosive growth, JUUL sold e-cigarettes in a range of flavors that appealed specifically to teenagers, including "mango," "crème brûlée," "mint," and "fruit medley" flavors. Youth perceive that flavored e-liquids are meant for them. A survey conducted by Stanford University researchers found that 73.8% of young new JUUL users tried flavored e-cigarettes first, confirming that JUUL's flavored products are designed to and have the effect of attracting new, underage smokers.

107.    Third, JUUL appealed to those individuals who are constantly seeking the latest technology. Young consumers, and teenagers in particular, are known to be drawn to new technologies, and many tried JUUL because it was broadly marketed as the newest technology gadget, with a sleek, high-tech design.

108.    Fourth, and perhaps most importantly, JUUL developed a marketing strategy in its early years that was specifically designed to, and did in fact, target young and underage users.

109.    A study published January 31, 2019 by researchers at the Stanford University School of Medicine (the "Stanford Study") performed a comprehensive analysis of JUUL's marketing during its first six months of operation, concluding that JUUL's marketing during that period was "patently youth oriented." For the two-and-a-half years following that period, although JUUL's targeting of youth was more subtle, the Stanford researchers found the youth focus was still very much present, including distribution of advertising on social media channels frequented by youth, amplified by faux-viral campaigns for which young and underage users were the known and intended targets.

110.    Shortly after its launch, JUUL also hosted entertainment events that were specifically youth-oriented, focused on music and movies. Fliers for the events circulated on social media depicted young models designed to appeal to potential teenage users. Example of two such invitations are depicted below:

 

111.    Images posted on social media from the events featured a youthful audience, with models at the events appearing in their twenties and posing in ways affiliated with teen behavior, such as wearing a hat backwards or holding a skateboard, or wearing a Pokemon backpack as if the model had just stopped over at the event after having finished school for the day. The message was not subtle: JUUL was the coolest new after-school activity. Samples of images posted on social media from the events follow:



112.    The invitees to the events included so-called social media "influencers." Influencers are social media personalities with substantial numbers of followers. Influencers can provide a highly effective method to market a product because social media posts by influencers appear to provide the opinion of the influencer; it is not usually apparent from a post that the post is paid advertising. The principal focus of the launch events was to draw a group of youthful influencers with gifts of JUUL products in order to convince the influencers to popularize JUUL's products on the influencers' social media accounts.

113.    Most notably, social media influencers are particularly effective at reaching young, teenage audiences. Teenagers read fewer traditional print publications and watch television much less than older people, but teenagers are much more likely than older people to spend substantial amounts of time on social media. Therefore, conveying marketing through social influences is a highly effective method to reach teenagers. This was precisely JUUL's marketing approach at

launch, to popularize its product with young potential customers via social media rather than through traditional advertising, which would reach an older audience.

114.   For example, a popular social media influence, "DonnySmokes," who at the time was a 21-year old YouTube personality with more than 120,000 subscribers, was a major promoter of JUUL products. He posted a video to YouTube depicting a JUUL "unboxing" (an unboxing is a YouTube video depicting a user's opening of a box containing a product and discussion of the product). Later, DonnySmokes posted a video directing children how to hide JUUL devices from their parents, which, among other questionable content, led to the termination of his YouTube channel for violation of YouTube's terms of service. Although DonnySmokes, who some have called "the Marlboro Man of YouTube," no longer posts videos, hundreds of videos of young people unboxing and demonstrating video—many of them likely paid by JUUL—remain on YouTube and can easily be found simply by searching for "JUUL."

115.   To advance its social media influencer strategy, JUUL hired marketing staff to manage social media influencer engagements. That is, social media influences were not a viral phenomenon beyond JUUL's control; instead, they were a core part of JUUL's marketing strategy. Companies such as JUUL pay social influencers to promote their product on their social media channels. Social influencer promotions are, in substance and form, paid advertisements.

116.   JUUL drove brand awareness not only through paid social media influencers but also through encouraging unpaid social media users to distribute its advertising and brand name. In particular, JUUL promoted the use of hashtags, which are words social media users attach to a symbol (for example, "#" on Twitter, such as "#juul") in order to spread viral content, such as memes. The Stanford Study examined social media posts marked with JUUL-related hashtags and

found nearly 70% of Twitter posts tagged with "#juul" to be youthful. Below are a few examples of such youth-oriented memes to which JUUL-related hashtags were attached:



117.    Although there is no direct evidence that the above posts and others like it were generated or circulated by JUUL directly, JUUL actively encouraged social media users to spread

the JUUL brand through such posts, and JUUL relied upon such peer-to-peer advertising to promote and expand its brand to new, young users.

118.     Yet another example of the viral spread of JUUL popularity among youth are online communities that formed to specifically discuss underage use. For example, a discussion group on social media site Reddit was formed called "UnderageJuul." The group provided a forum to discuss how teenagers could identify retailers that did not enforce age verification and strategies for concealing JUUL e-cigarettes from parents. The group also provided a marketplace for users to purchase JUUL products for other users, for a small fee.

119.     In addition to social media influencers, JUUL also used celebrities in its marketing, focusing in particular on celebrities popular with teenagers. For example, JUUL posted images on Facebook and Instagram accounts of Katy Perry (known for her popular album, "Teenage Dream," and winner of multiple Nickelodeon Kids' Choice awards and Teen Choice Awards) holding a JUUL.

120.     JUUL's traditional marketing materials were also specifically geared toward a youthful audience. Its launch campaign, called "Vaporized," featured models in their twenties appearing in trendy dress. Like the social media posts concerning launch events, the models' poses depicted in JUUL's marketing materials reflected behaviors associated with underage teens rather than mature adults. The vivid color scheme was designed to appeal to youth. Examples of advertising from the "Vaporized" campaign are below:



121.    JUUL's marketing campaign propagated quickly across social media. Consistent with the content of its advertising, JUUL's social media was followed avidly in particular by underage consumers. An analysis of JUUL's official Twitter account published in 2018 in the Journal of Adolescent Health found that 25% of its followers were youth under the age of 18, and that they often shared JUUL's tweets with other underage teenagers.

122.    JUUL made extensive use of social media to market JUUL e-cigarettes, but there was one notable piece of information absent from its social media pages: there was no reference

on JUUL's social media pages warning consumers about the dangers of nicotine addiction until as late as October 2017, after millions of teenagers were already addicted by JUUL.

123.    Although its marketing scheme, as a general matter, was focused on social media, JUUL did advertise in some traditional media as well. Its selection of such traditional publications, however, is notable. JUUL selected a single magazine to launch its advertising campaign: VICE magazine, a pop culture publication which markets itself to advertisers such as JUUL as the "#1 youth media company." Although JUUL insisted its mission was to reach "adult smokers," the substance and location of its advertising indicates the opposite: its mission was to recruit new, young consumers into tobacco addiction.

124.    To further target children, JUUL purchased advertisements on websites designed for young children. JUUL marketed its products by purchasing banner advertisements and video advertisements on nick.com—the website for the children's television network Nickelodeon. JUUL also purchased banner advertisements on nickjr.com, the website for another Nickelodeon television channel, "Nick Jr.," which targets an even younger audience.

125.    JUUL also purchased advertisements on the Cartoon Network's website at cartoonnetworok.com—a website that offers children's television programming and games for children.

126.    JUUL also purchased websites on a number of other websites with primarily underage audiences, such as allfreekidscrafts.com, hellokids.com, and kidsgameheroes.com.

127.    JUUL also engaged in in-person marketing directly to underage consumers. JUUL representatives gave talks at high schools that were pitched to high schools as anti-addiction talks, but when teachers would leave the room, the JUUL representative, as one parent described it during Congressional testimony, "gave a confusing talk about Juul, telling them it was not for kids

33

but for adults. It was much safer than cigarettes. The FDA would approve it any day." A teen testified during the same Congressional hearing that JUUL representatives made a presentation to his ninth-grade class, during which JUUL representatives repeated to the 9th graders that JUUL was "totally safe." The "anti-addiction" talks were, in reality, sales pitches.

128.    JUUL's sales trends that followed the marketing campaign made clear that the campaign appealed to underage teens. As noted above, teenagers were much more likely to use JUUL products than even young adults in their twenties or thirties. JUUL's customer base was children, not adults. JUUL followed the Altria-inspired playbook of hooking new nicotine addicts at a young age, which, together with a cultivation of brand loyalty, would result in lifelong customers and persistent profits.

129.    Driven by its marketing and appeal to underage consumers, by July 2018, JUUL commanded a 68% share of the United States market for e-cigarettes, a nearly eightfold increase from its market share a year prior. Altria's MarkTen was a distant second in terms of U.S. market share. In July 2018, JUUL raised $650 million, giving it a valuation of $15 billion.

## VI.    JUUL Switches from One Illegal Marketing Scheme to Another.

130.    In 2018, JUUL faced increasing publicity and regulatory pressure due to its marketing to underage users. In response to this new scrutiny, JUUL shifted its marketing campaign in mid-2018, switching focus from one illegal scheme—marketing to underage consumers—to another: making unsubstantiated product claims. JUUL began a campaign reminiscent of the "light" cigarette campaign decades before, suggesting that e-cigarettes were an effective harm reduction tool and a safer alternative to combustible cigarettes.

131.    JUUL launched its "SWITCH" campaign, with advertisements designed to convey the message that consumers would experience a benefit from "switching" from combustible cigarettes to electronic ones.

132.    Notably, although JUUL's traditional marketing such as print advertising shifted in focus to the "Switch" campaign, its marketing emails continued to promote flavors such as mango, which, as noted, appeal in particular to prospective youth consumers.

133.    Moreover, the "SWITCH" campaign itself, although superficially appearing to be directed to older, establish smokers, also had an appeal to young nonsmokers. Although at first this may seem counterintuitive, studies have shown that younger consumers place substantial value on corporate responsibility. The Stanford Study summarized this angle as follows: "Positioning itself as the rebel outside seeking to disrupt the tobacco industry while saving billions of lives is likely a core element of the brand's appeal to youth." That is, new underage users attached value to JUUL's marketing as a socially responsible message of saving smokers from harmful combustible cigarettes, and provided social justification to new, underage consumers to start a nicotine habit under the assumption that JUULs were a healthier alternative to cigarettes.

134.    The "Switch" campaign was part of a broader corporate imaging strategy through which JUUL attempted to paint itself as a savior for existing smokers, but with respect to its youth customer base, the opposite was true. A survey conducted by Stanford researchers concluded that teenage consumers tended to use both electronic and combustible cigarettes; only a very small percentage (2.5%) exclusively used e-cigarettes. This evidence indicates that for young consumers, e-cigarettes were a steppingstone to combustible cigarettes, not the other way around.

135.    The "SWITCH" campaign was amplified by public statements JUUL made about the safety of its product relative to other nicotine products such as cigarettes. A "Letter from the CEO" posted on JUUL's website on May 8, 2018 claimed, "JUUL's simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it." JUUL did not have evidence

35

to substantiate this claim, and JUUL did not have FDA approval to market a device as presenting a reduced tobacco risk, as required under the Food, Drug & Cosmetics Act.

**VII.   Altria Attempts to Join Forces with JUUL, While JUUL Tries to Eliminate Its Primary Competitor.**

136.    JUUL's ascendancy presented two problems for Altria. First, JUUL stood in the way of Altria's effort to lead the market for e-cigarettes. Second, JUUL's popularity threatened to accelerate Altria's losses in the market for combustible cigarettes, thus undermining what remained Altria's core business.

137.    Altria responded to JUUL in two ways. First, Altria competed aggressively with JUUL, including through price promotions and product innovation. At the same time, however, Altria also sought to eliminate the threat by acquiring JUUL.

138.    In the spring of 2017, defendant Willard began confidential discussions with JUUL concerning a potential acquisition or partnership. Throughout the rest of 2017 and into 2018, Altria repeatedly initiated contact with JUUL, but negotiations did not progress. Defendants Willard, Gifford, and Crosthwaite were the primary Altria representatives engaged in negotiations with JUUL.

139.    In February 2018, after little progress in negotiations had occurred, defendant Willard directed defendant Crosthwaite to "get JUUL done"—referring to the acquisition or partnership that Altria desired. Defendant Crosthwaite thereafter played a key role in negotiating the terms of a potential agreement with JUUL. At the same time, however, Altria pressed forward with its own product in direct competition to JUUL, launching in February 2018 its MarkTen Elite, a pod-based e-cigarette very similar the JUUL's product. Altria's then-COO defendant Willard expressed a goal at that time "to lead the U.S. e-vapor category." He also said at the time in an interview with the Wall Street Journal: "At a time when e-vapor is growing rapidly and [will]

36

likely cannibalize the consumers we have in our core business, if you don't invest in the new area you potentially put your ability to  deliver that financial result at risk."

140.    During the summer of 2018, negotiations between JUUL and Altria picked up. The future of Altria's e-cigarette business emerged as a key point of contention. JUUL took the position that Altria's exit from the e-cigarette market was a requirement for any deal JUUL would enter. That is, before JUUL would permit Altria to invest in JUUL, Altria—then the second highest selling e-cigarette maker—would have to agree not to compete with the market leader, JUUL.

141.    On July 30, 2018, defendant Pritzker emailed defendant Willard an opening term sheet. The contents of the term sheet indicated that continued competition from Altria's e-cigarette products was, in JUUL's view, not a permissible path forward.

142.    On August 1, 2018, negotiations between Altria and JUUL took place at the Park Hyatt Hotel in Washington, DC to discuss terms. The attendees of this meeting included defendants Pritzker and Valani (members of JUUL's board) and defendant Burns (JUUL's CEO), as well as defendant Willard (Altria's CEO) and defendant Gifford. JUUL reiterated at the meeting its demand that as part of any transaction, Altria agree not to compete with JUUL in the e-cigarette market.

143.    On August 5, 2018, defendant Valani met with defendant and Altria director Devitre, again impressing the importance of the non-compete provision.

144.    On August 15, 2018, defendant and JUUL board member Valani met with defendant Devitre, one of Altria's board members, at Devitre's offices in New York. JUUL delivered a simple message to Altria: there would be no deal unless Altria agreed to cease competing with JUUL in the e-cigarette market.

37

145.     During negotiations, Altria repeatedly sought to weaken any limitation on its ability to compete with JUUL, but JUUL repeatedly pushed back, underscoring that Altria's exit from the market was a non-negotiable term of any agreement.

146.     Although negotiations paused briefly over JUUL's insistence on Altria's agreement not to compete, negotiations resumed in early October 2018, at which point Altria indicated its agreement to JUUL's demand that Altria exit from the e-cigarette market and agree not to compete in the future. Specifically, on October 5, 2018, defendant and Altria CEO Willard sent defendants Pritzker, Valani, and Burns a letter reassuring them that Altria would exit the market.

147.     After Altria made this concession, and Altria's investment in JUUL was imminent, Altria took a number of steps to prepare for meeting its anticipated non-compete obligation. First, on October 25, 2018, Altria announced it was withdrawing from the market its MarkTen Elite product—the product that most closely resembled JUUL's pod-based product. This market withdrawal occurred only eight months after Altria had introduced the MarkTen Elite, a product which it had described as driving growth and gaining transaction among consumers.

148.     Only a few days after this announcement, Altria and JUUL agreed to the basic terms of the deal that would ultimately become the Altria-JUUL Agreements, including the non-compete provision upon which JUUL insisted. That is, it appears Altria's announcement of the withdrawal of the primary competitive threat to JUUL's product was the key event that enabled JUUL to commit itself to the terms of a deal.

149.     Then, on December 7, 2018, Altria ended the remainder of its e-cigarette business. This withdrawal came just two weeks before JUUL and Altria would announce the JUUL-Altria Agreements. Two days later, Altria's General Counsel emailed JUUL's Chief Legal Officer to further discuss the deal, moving it closer to finalization.

150.    At the time of these major withdrawals of apparently growth-driving products, Altria offered the false public explanation for its withdrawal that it was concerned with the rise in underage use of e-cigarette products. This explanation, however, was a smokescreen, given that Altria was on the verge of making a major investment in a company built upon underage use of e-cigarette products. The true purpose of Altria's withdrawal from the market was its capitulation to JUUL's anticompetitive demand that Altria no longer compete with JUUL.

151.    Prior to the Altria-JUUL Transactions, Altria had every intention to remain in the e-cigarette market for the long-term, as reflected in the substantial investment leading to the introduction of its MarkTen Elite pod-based cigarette in February 2018.

152.    Just a couple of weeks later, Altria and JUUL would finalize and announce their agreement for Altria to invest in JUUL, described below.

## VIII.    Before JUUL and Altria Entered the JUUL-Altria Agreements, Altria Was Fully Aware that JUUL's Success Was at Imminent and Substantial Risk Because JUUL's Success Was Built Upon Illegal Conduct.

153.    While Altria was negotiating a transaction through which it would acquire or partner with JUUL, there were clear signs emerging indicating that JUUL's successes were at imminent risk due to public backlash and forthcoming regulation.

154.    Critically, JUUL's youth-oriented marketing campaign, which propelled its brand to market leadership, derived directly from the tobacco's industry's strategies decades prior. The Stanford Study compared JUUL's advertising to the tobacco industry advertising, finding that JUUL's ads were "closely aligned with that of traditional tobacco advertising." Defendant Monsees in fact admitted in an interview with the authors of the Stanford Study that JUUL's advertising had been informed by traditional tobacco advertisements, and that JUUL had in fact used a public database of historical tobacco advertising as source material for its own ads.

39

155. The Altria Defendants, of course, would have been fully aware of this strategy, with many of them being tobacco industry veterans thoroughly familiar with Altria's checkered past with respect to youth advertising. Defendants Willard, Gifford, and Crosthwaite, the primary Altria representatives engaged in negotiations with JUUL, were personally tobacco industry veterans thoroughly familiar with Altria's historical misconduct and were capable of identifying JUUL's misconduct that was inspired by and patterned after Altria's misconduct. They were particularly knowledgeable about the risks JUUL faced by targeting teenagers.

156. The FDA, in April 2018, announced it was considering enforcement action to counter underage sales of JUUL e-cigarettes. It requested documents from JUUL to evaluate the causes of underage use of JUUL and whether JUUL's marketing contributed to such underage usage. The FDA indicated that the request was based on "growing concern about the popularity of JUUL products among youth," and that "JUUL products appear to be common in middle and high schools based on widespread media reporting describing a rapid growth of use among youth in general and on school property." The FDA expressed concern that "JUUL products may have features that make them more appealing to kids and easier to use, thus causing increased initiation and/or use among youth." The FDA stated: "It's clear there's a need for strong federal enforcement [to ensure] youth access restrictions," and that the FDA would take steps to "hold them [manufacturers, including JUUL] accountable."

157. On June 7, 2018, facing a risk of bans on its flavored products, JUUL appealed directly to its customers via email to oppose flavor bans by posting comments to the FDA in support of flavored nicotine products. JUUL sent a second such appeal on December 8, 2018, targeting in particular citizens of California, where such a ban was being considered. In short, JUUL saw flavored cigarettes, which appeal to youth, as a sufficiently important part of its

business strategy to appeal directly to consumers to resist regulation of the same. JUUL's direct consumer appeals echoed the strategy reflected in the "Frank Statement" by tobacco companies decades earlier (discussed above).

158.    Amid this regulatory scrutiny, JUUL in July 2018 did something extraordinary. It deleted almost all its social media history. Even more remarkable was JUUL's explanation. A JUUL spokesperson indicated at the time that the reason behind the purge was to remove youth-oriented content, and that more than 4,000 such posts were removed. The removed posts include all posts made as part of its "Vaporized" campaign. JUUL's own explanation for the social media purge reflects a direct admission that its growth as a company was fueled in large part by targeting new, youth consumers to its product.

159.    A second social media purge occurred in August 2018, leaving behind only a few posts as part of JUUL's then-new "SWITCH" campaign.

160.    In September 2018, the FDA described youth e-cigarette use as an "epidemic" and requested that JUUL submit a plan to tackle youth use of its products. The FDA required that the plan "immediately and substantially reverse [the] trends" or face adverse regulatory action by the FDA. The letter pointed to the use of flavored products such as JUUL's, indicating that the FDA "believe[d] that certain flavors are one of the principle drivers of the youth appeal of these products."

161.    On the same day, the FDA sent warning letters and civil monetary complaints to 1,300 retailers who illegally sold JUUL and other e-cigarette products to minors during an undercover operation. The FDA said that it would take further action to "target the illegal sales of e-cigarettes to youth, as well as the kid-friendly marketing and appeal of these products." The threat of enforcement action against retailers and regulatory action relating to youth-oriented

advertising were both substantial threats to JUUL, as underage use of its products comprised a substantial portion of its revenue.

162.    On September 28, 2018, the FDA seized documents from JUUL headquarters as part of a surprise inspection.  The documents related to JUUL's sales and marketing practices. The seizure was widely reported in the media and led U.S. Senators Dick Durbin and Lisa Murkowski to urge the FDA to immediately ban child-friendly e-cigarette flavors and restrict online sales of nicotine products, based upon reporting that online nicotine retailers with lax age verification were a primary method through which underage consumers could buy JUUL products.

163.    In attempt to fend off more vigorous regulation, JUUL took additional small, yet intentionally ineffective, steps designed to create the appearance that JUUL was attempting to reduce its marketing to underage users.  In November 2018, one day before the FDA would announce proposed steps to prevent youth access to e-cigarettes, JUUL released a so-called "action plan" to counter youth use. These steps included halting social media advertising in the United States (which it had largely already done) and limiting the sale of flavors other than tobacco and mint/menthol to JUUL's age-restricted website.

164.    JUUL's action plan reflected an admission that JUUL's focus on social media advertising was designed to and had the effect of targeting underage new smokers and that flavored JUUL e-cigarettes was a driver of underage use of JUUL's products.

165.    JUUL's "action plan" did not reflect a genuine effort to curb underage use of its products, for multiple reasons. For one, JUUL's mint and menthol flavors—which it proposed to keep selling across retail outlets—were among the most popular flavors among youth. Moreover, studies have shown that age-restricted websites selling e-cigarettes are largely ineffective at keeping e-cigarettes out of children's hands.

166.    Specifically, a study published in the journal JAMA Pediatrics found that teenagers were readily capable of circumventing age restrictions imposed by internet tobacco vendors, in part because of inadequacies in online verification systems and in part because of a failure of couriers to enforce age verification services for deliveries. The researchers' findings were consistent with prior studies that had "documented that teens can and do buy cigarettes online." The restriction of flavored e-cigarette sales to online stores may have appealed to younger consumers, given that younger consumers tend to be more tech savvy and are more likely to purchase products online.

167.    Moreover, JUUL specifically designed its website to permit sales to underage users. JUUL engaged a company called Veratad to provide age verification services for its website (Altria was another client of Veratad). Veratad encouraged its clients including JUUL to "create [their] own verification rules"—that is to customize age verification based on corporate need. JUUL and Veratad implemented an age verification system for JUUL's website they designed to maximize the number of prospective purchasers who "pass" the process, rather than minimizing the number of underage sales. Most of the time, simply providing a name, address, and date of birth matchable to public records would be sufficient to pass age verification. According to an internal Veratad document, JUUL and Veritad worked together to find ways to "bump up" [JUUL's] rate of people who get through age verification, including by modifying the verification system to allow users multiple opportunities to "pass." Fewer than half of customers who ultimately made an online purchase passed age verification on the first attempt.

168.    In November 2018, the Centers for Disease Control and Prevention ("CDC") reported that e-cigarette use among American high school students had reached 20.8%, representing a 78% increase from just one year prior.

43

169.    During the months leading up to Altria's agreement to invest in and cease competition with JUUL, JUUL was featured in an avalanche of negative press coverage, which reflected a growing concern among the consuming public about the dangers posed by JUUL and imminent regulatory action that would fundamentally undermine JUUL's business. A small, but characteristic sample, follows:

a.      In an October 19, 2018 article entitled, "JUUL's social media campaign resonates alarmingly among teens," Reuters highlighted JUUL's business strategy of marketing to teenagers, reporting a study's results, discussed above, indicating that a substantial portion of JUUL's Twitter audience was teenagers. The article quoted a Columbia University pulmonologist explaining that JUUL's marketing strategies "are definitely reminiscent of the way tobacco companies used to target youth."

b.      An October 30, 2018, Business Insider Article entitled, "We just got our first look at how many minors are using Silicon Valley's favorite e-cig, and it doesn't look good," reported the results of a survey indicating that young people aged 15-17 are using JUUL's e-cigarette product at a rate roughly six times higher than consumers aged 25-34. The article explained "the new survey data suggest for the first time that underage 'Juuling' is a real phenomenon and not simply the result of overblown fears propelled be media hype." The article reported that JUUL use now surpassed combustible cigarette by teenagers—an ominous sign for traditional tobacco companies.

c.      An October 31, 2018 research report by Morgan Stanley found that 15% of JUUL users weren't smokers before they started using e-cigarettes, and that subgroup tended to be younger. An article the next day in the Business Insider discussing the Morgan Stanley report reported a 75% rise in teen e-cigarette usage that was driving the FDA to

implement new policies "by the end of the year" to regulate e-cigarette usage, including restrictions on the use of flavors/

     d.     A November 1, 2018 article by NBC News, entitled "As teen use of JUUL soars, doctors ask, what's really in these e-cigs?" reported how JUUL e-cigarettes had become popular among high schoolers, noting that since JUUL hit the market in mid-2015, e-cigarette use among teens had "exploded." The article emphasized the FDA's description of e-cigarette popularity among youth as an "epidemic." The article reported on the FDA's September direction to JUUL and other e-cigarette manufacturers to submit plans to prevent youth access to e-cigarettes. The article explained that the "deadline is fast approaching, leaving the FDA with a complicated decision to make—restrict access to a product that advocates say is helping adult smokers quit cigarettes, or permit access while kids revive a nicotine habit that had previously been at an all-time low."

     e.     A November 30, 2018 article published in the Atlantic, entitled "Juul's New Marketing Leaves Out Help for Addicted Teens," reported on JUUL's purging of its social media accounts to atone for "[t]he sin" of "[h]elping to introduce millions of American teens to nicotine." The article quoted a Stanford professor of pediatrics as explaining: "Juul is trying to look good and not do good. They didn't make these announcements until it became clear they were going to have to do it anyway." The article also reports on research showing that most teenagers did not realize that JUUL's contain nicotine just like cigarettes but instead were focused more on the "wonderfully flavored" nature of the product.

170.     By November 13, 2018, on the eve of Altria's investment in JUUL, the only flavors available in the United States were tobacco, mint, and menthol. Although withdrawing some youth-targeting flavors was a step in the right direction, it was entirely clear at the time that such

steps were not enough, and JUUL faced imminent and substantial regulatory action that would dramatically affect its business.

171.    In the months leading up to Altria's investment in JUUL, JUUL also began seeing the beginning of a wave of litigation relating to its marketing to youth and its deceptive product safety claims. Defendant Willard has admitted in testimony that at the time of Altria's investment in JUUL, Altria was aware of the early litigation concerning JUUL's marketing.

172.    State attorneys general had also launched investigations into JUUL, which both Altria and JUUL would have known was likely to result in complaints being filed against JUUL. Recall: when state attorneys general went after the big tobacco companies decades prior, the result was the Master Settlement Agreement—an agreement that dramatically curtailed Altria's and other tobacco companies' business. JUUL and Altria knew that JUUL faced the same risk as state attorney general investigations began accumulating.

173.    In October 15, 2018, the North Carolina Attorney General announced an investigation into JUUL, reasoning that "[t]he use of e-cigarettes among young people is increasing at staggering rates." Likewise, in July 2018, the Massachusetts Attorney General announced an investigation into JUUL over concerns about sales of JUUL products to minors.

174.    Prior to its investment, Altria executives also acknowledged the risk that youth vaping posed to the nicotine industry as a whole. Defendant Willard acknowledged that underage use of JUUL products was a "big problem" that "could put the whole category at risk." In an October 9, 2018 earnings call, Willard stated, in response to a question about an action brought against JUUL by the Massachusetts Attorney General: "I think what we're seeing is that for quite some time, the tobacco industry has been expected to operate under a very specific set of rules, and the [Master Settlement Agreement] laid those out for the cigarette category. [They are]

watching everything we do." That is, Altria understood that partnering with or investing JUUL would expose JUUL's practices to more scrutiny.

175.    Altria's understanding of the serious risk of an investment in or partnership with JUUL was amplified by Altria's due diligence in advance of its investment. Altria had access to internal JUUL documents and other projections that would have indicated a degree of risk even greater than what was publicly disclosed. As tobacco industry veterans, the Altria Defendants would have understood fully the jeopardy in which they would place the company by pressing forward with an agreement with Altria.

176.    According to allegations made in a securities class action against Altria, based on JUUL's internal documents, even before the parties reached an agreement in December 2018, Altria and JUUL worked closely together, and JUUL provided Altria with detailed information concerning the design and nicotine content of its product, the labeling of its product, and other topics including advertising, distribution, online sales, age verification procedures, and information on underage user's preferences. For example, defendant Burns commissioned a study from McKinsey & Co. on the "likeability" of various flavors of cigarettes, and Altria helped strategize on how to take commercial advantage of such information.

## IX.    JUUL and Altria Were Aware Prior to the JUUL-Altria Agreements that JUUL's Products Posed a Substantial, Acute Health Risk.

177.    As described below, shortly after Altria invested in JUUL, a series of reports of serious health problems among JUUL users, including seizures and other acute medical conditions, gathered widespread media attention and regulatory scrutiny. These events were entirely foreseen by Altria prior to its investment, however, given what was known of the health risks of JUUL's products and the negative health events that had already occurred at the time of Altria's investment.

178.    A series of reports prior to Altria's investment chronicled the serious health risks of JUUL usage. In 2012, for example, an article reported the case of a 42-year old woman admitted to a hospital with a seven month history of dyspnea, cough, and fevers that began with the patient began using e-cigarette products. The authors identified glycerin-based oils found in e-cigarette nicotine vapors as a possible, logical cause.

179.    Along the same lines, a 2014 report described a 20-year-old previously healthy U.S. active-duty male sailor who presented with a three-day history of persistent cough, shortness of breath, and facial flushing, which began when he started using e-cigarettes. The patient was diagnosed with pneumonia.

180.    A series of additional case reports in 2015 and 2016 chronicled acute respiratory syndromes that appear to have been associated with e-cigarette use. The case reports were not widely publicized at the time, but Altria and JUUL, as major industry participants, would have been aware of them and would have realized it was only a matter of time until such negative events blossomed, in part because as medical practitioners and patients became aware of the link between e-cigarette use and acute medical events, many additional events caused by e-cigarettes including JUUL's products would begin to be identified, where no such connection had been made before. That is, practitioner and patient awareness, when it rose to a critical threshold, would uncover an already existing epidemic of negative health outcomes from JUUL usage.

181.    Altria also knew prior to its investment of serious neurological problems that could be caused by e-cigarette usage. Nicotine toxicity was a known consequence of excessive vaping. Nicotine-induced seizures had long been considered a side effect of long-term nicotine exposure. Altria knew prior to investment that JUUL's high nicotine content and addictive nature cause users

to be susceptible seizures. JUUL's devices were, in fact, designed to deliver high concentrations of nicotine, exacerbating the risk of seizure.

## X.    JUUL and Altria Reach an Agreement.

182.    On December 20, 2018, Altria and JUUL entered into a series of related agreements. First, through a Purchase Agreement, Altria acquired a 35% non-voting equity interest in JUUL in exchange for $12.8 billion in cash—the largest equity investment in United States history. The non-voting interest was convertible to a voting interest upon approval by the FTC.

183.    Although Altria would initially not have any right to appoint individuals to serve on JUUL's board, Altria would have the right to appoint three directors upon the conversion of its shares to voting securities (a conversion that required regulatory approval). Moreover, before the conversion, Altria gained a right to have an observer attend board meetings, permitting it to participate in board meetings even though it had no decision-making power. Altria appointed defendant Crosthwaite to observe on JUUL's board until September 2019, when he became JUUL's CEO. At that point, defendant Gifford became the Altria board observer, giving him direct access to JUUL's information and providing him the ability to coordinate activities between JUUL and Altria.

184.    The $12.8 billion investment for a 35% stake valued JUUL at $38 billion. This valuation, notably, was more than 2 ½ times JUUL's valuation from another investment just five months prior. That is, Altria's investment implied a dramatic increase in value in JUUL over the few months leading up until the investment, even though, during those five months, it had become clear that JUUL's core business strategy was at risk, with public backlash building and potentially crippling regulation imminent.

185.    Through another agreement, the Relationship Agreement, Altria committed to providing JUUL access to Altria's retail, marketing, and distribution apparatus. Altria agreed to

lease its highly favorable convenience store shelf space to JUUL, and Altria agreed to support JUUL in both marketing and sales, meaning that Altria would not simply be a passive investor; it would become closely involved with the operation of JUUL's business. This participation in JUUL's business increased Altria's exposure to liability to third parties as a direct participant in JUUL's unlawful and deceptive conduct.

186.     Finally, as part of the Relationship Agreement, Altria followed through on its agreement to JUUL's most important demand—that Altria agree not to compete with JUUL in the e-cigarette marketplace. As noted, Altria had already withdrawn its competing products at the time of the agreement; those withdrawals, despite Altria's publicly claimed altruistic intentions, were effected to convince JUUL to finalize the transactions with Altria.

187.     The non-compete provision was comprehensive. It provided:

> [Altria] shall not . . . directly or indirectly (1) **own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business**; (2) take actions with the purpose of **preparing to engage in the e-Vapor Business**, including through engaging in or sponsoring research and development activities; or (3) **Beneficially Own any equity interest** in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, **that engages directly or indirectly in the e-Vapor Business** (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business)….

(emphasis added).

188.     That is, a core term of the agreements between Altria and JUUL was that the two companies who, just prior to the agreements, were the two largest participants in the United States e-cigarette market, agreed not to compete against each other. Because Altria did not obtain voting rights on JUUL's board immediately, the agreements did not at the time require regulatory

approval, but the flagrant illegality of this agreement not to compete would soon come to the attention of competition regulators.

## XI.     JUUL Faces Severe, Yet Fully Anticipated, Public and Regulatory Backlash Shortly After Altria's Investment.

### A.     *JUUL Faces Continuing, Punishing Backlash to Its Youth Marketing Scheme and False Health Claims.*

189.     As discussed above, before JUUL and Altria entered the related agreements on December 20, 2018, JUUL had already been facing substantial public backlash from having targeted youth in its sales and marketing, and substantial regulatory action appeared imminent. After the transaction with Altria closed, the anticipated, further reaction occurred.

190.     On March 13, 2019, the FDA released a statement on the need for increased enforcement with respect to e-cigarette use. The FDA announced a plan to "put[] nicotine at the center of [the FDA's] regulatory efforts." It warned that "it has become clear that a recent surge in e-cigarette use among youth…is threatening the progress we've made in reducing youth tobacco use," pointing to statistics that more than 3.6 million middle and high school students in the United States are e-cigarette users. The FDA stated that it "expect[ed] that some flavored e-cigarette products will no longer be sold at all," and others will be sold "only in a manner that prevents youth access" while also requiring "premarket authorization."

191.     On April 4, 2019, the FDA announced an investigation regarding thirty-five reported seizures associated with the use of e-cigarettes. The seizures afflicted young consumers in particular. Although a causal link had not yet been definitely established, FDA Commissioner Scott Gottlieb said in a statement: "We know that nicotine isn't a harmless substance, especially in the brain of our youth."

192.     The FDA's announcement was just the tip of the iceberg. In the ensuing months, a wave of reports of vaping-related illnesses and deaths, including from various pulmonary and

neurological problems, would grip the country, receiving wide coverage in the press and putting significant pressure on regulators to act more quickly and swiftly in addressing the epidemic of youth use of JUUL and other e-cigarette products.

193.    During the summer of 2019, healthcare providers started to identify an influx of acute respiratory failure and a myriad of lung injures in patients who were using e-cigarettes. This prompted a CDC investigation into an outbreak of vaping related lung injuries. As described above, it is highly likely this epidemic began long before Altria's investment in JUUL, and that Altria was aware of it. It was not until the publicity of such medical problems that medical practitioners and patients began more broadly connecting the dots between symptoms and e-cigarette use.

194.    As greater attention was drawn to the issue, research occurred in 2019 and 2020 that decisively connected the health problems that were being observed to e-cigarette use. A 2020 publication published in the CDC's Morbidity and Mortality Weekly noted nearly 2,000 cases of vaping related lung injuries at the time of its writing, identifying Vitamin E Acetate contained in e-cigarette vapor as one possible cause of the recent outbreak of lung illness.

195.    On July 24, 2019, the United States House of Representatives Subcommittee on Oversight and Reform held a hearing focusing specifically on JUUL, entitled "Examining JUUL's Role in the Youth Nicotine Epidemic." The hearing, which was widely reported in the media, featured testimony from an organization representing parents whose children had become addicted to nicotine via JUUL and other products who sought help for their "JUUL-dependent, nicotine-addicted kids."

196.    On August 3, 2019, the FDA and CDC announced they were collaborating to investigate vaping related illnesses. They indicated they would be "working tirelessly to

investigate the distressing incidents of severe respiratory disease associated with the use of e-cigarette products."

197.    On September 9, 2019, the FDA sent a formal warning to JUUL for the "unauthorized marketing [of] modified risk tobacco products, including outreach to youth." The warning letter indicated that the FDA had determined that JUUL has "explicitly and/or implicitly…represented that…JUUL products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products," pointing to statements JUUL had made in the past that its products were "99% safer than cigarettes" and were "totally safe," among others.

198.    The FDA warning letter indicated that JUUL's marketing violated the Food, Drug & Cosmetics Act because it marketed a "modified risk tobacco product" without FDA approval. The letter referred specifically to the "Make the Switch" campaign, concluding that the campaign conveys that switching to JUUL is a safer alternative to cigarettes. The warning letter directed JUUL to "immediately correct the violations" referenced in the letter and threatened "civil monetary penalties, seizure, and/or injunction" if JUUL continued its false marketing of its products as provided a reduced tobacco risk.

199.    On September 19, 2019, the CDC and FDA held a joint briefing to discuss its continued investigation into "the occurrence of life-threatening illnesses in otherwise healthy young people reported from around the country" associated with e-cigarette use. The FDA stated that it continued to pursue parallel criminal prosecutions. The CDC disclosed that the government continued to receive reports of additional illnesses and death; it was an "ongoing outbreak."

200.    On October 3, 2019, the CDC had a press briefing at which it announced that "the outbreak of pulmonary injury associated with e-cigarette use, or vaping, is continuing at a brisk

pace" and that there had by that time been more than 1,000 lung injury cases reported, resulting in 18 known deaths, including 275 cases reported in the preceding week alone.

201.    In addition to the negative press coverage and regulatory reaction, both JUUL and Altria have been named as defendants in hundreds of lawsuits relating to JUUL's products from a range of plaintiffs, including school districts and individual consumers. These lawsuits threaten substantial liability to the plaintiffs in those actions, plus liability for very large sums that will be expended for attorneys and other litigation costs to defend against the lawsuits.

202.    State attorneys general have also placed JUUL and Altria in the crosshairs. On May 15, 2019, the North Carolina Attorney general sued JUUL, focusing on JUUL's targeting of new, young users. This was no surprise, given that the North Carolina Attorney General had announced an investigation the prior October, two months before Altria's investment.

203.    On February 12, 2020, the Massachusetts Attorney General filed a complaint against JUUL, alleging that "JUUL's misconduct has created a public health crisis and an epidemic of youth nicotine use and addiction." Again, this complaint was no surprise; the Massachusetts Attorney General had announced the investigation prior to Altria's investment.

204.    Many other attorneys general likewise filed suit. On February 25, 2020, the Texas Attorney General announced a 39-state investigation into JUUL, resembling closely the coordinated investigation that state attorneys general initiated decades prior, which led to the Master Settlement Agreement.

205.    Moreover, on February 21, 2020, the SEC announced an investigation into Altria's investment in JUUL, including whether Altria adequately disclosed to shareholders the risks of the investment into JUUL. The SEC subpoenaed JUUL, and JUUL turned over to the SEC financial projections JUUL shared with Altria, but those internal projections have not become public.

206.    Altria also now faces a significant class action lawsuit by its shareholders, in which shareholders make allegations similar to those being investigated by the SEC—that JUUL deceived its investors by failing to disclose substantial risks arising from its investment in JUUL. Defendants Willard, Gifford, Bowen, Monsees, Burns, and Crosthwaite are each named as defendants in that lawsuit for statements they made that deceived investors.

B.    *The FTC Challenges JUUL and Altria's Anticompetitive Agreements.*

207.    As noted earlier, Altria's acquisition of a nonvoting interest in JUUL did not require regulatory approval, but conversion of Altria's shares to voting shares did require regulatory approval. In February 2019, Altria filed for clearance under the Hart-Scott-Rodino Act because it sought to convert its JUUL shares to voting shares. Only then did the FTC become aware of the terms of the Relationship Agreement—most notably, Altria's agreement not to compete with JUUL, but also its agreement to use its substantial marketing and distribution apparatus to further advance JUUL's already dominant position.

208.    On April 1, 2020, the FTC brought an administrative action challenging the anticompetitive terms of Altria's investment in JUUL, seeking to unwind the transaction.

209.    The FTC focused on Altria's agreement not to compete with JUUL, combined with Altria's agreement to provide JUUL access to its marketing, regulatory, and distribution resources, which would further help cement JUUL's dominance in the e-cigarette market. The FTC alleged: "By securing Altria's exit from the relevant market, the Transaction eliminated a threat to [JUUL's] market dominance. Respondents further ensured that dominance by agreeing that Altria would throw behind [JUUL] its extensive resources, including its distribution capabilities and its premier shelf space at retailers."

210.    The FTC alleges that the JUUL-Altria agreement harms competition in multiple ways, including (a) "[e]liminating Altria's MarkTen products from the relevant market, thereby

eliminating current and future price competition between [the companies]"; (b) "[e]liminating current and future innovation competition between [the companies]"; and (c) "[e]liminating current and future competition between [the companies] for shelf space at retailers through rebates and other incentives."

211.    The FTC's complaint concludes:

The conduct alleged herein amounts to an agreement whereby Altria agreed not to complete in the U.S. e-cigarette market now or in the future, in return for a substantial ownership stake in the market leader. This agreement unreasonably restrained trade in the U.S. market for e-cigarettes.

The FTC therefore alleged violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and violation of the FTC Act, 15 U.S.C. § 45. As of the date of this complaint, the case continues to progress, and Altria faces substantial uncertainty due to it.

C.    *The Altria Defendants Cause Altria to Actively Participate in JUUL's Wrongdoing.*

212.    As discussed above, part of Altria's agreement with JUUL was to provide it assistance in sales, marketing, and promotions. Altria followed through on these promises by working closely with JUUL, including through cross-promotion of products, such as including inserts in Altria's cigarettes advertising JUUL's products.

213.    Immediately upon its investment, Altria also jumped head-first into defending JUUL's products, products it had strongly criticized just months earlier as having been responsible for the recent increase in youth nicotine addiction.  (Altria submitted a letter in late 2018 to the FDA saying that the youth addiction crisis was being driven by the pod-based systems, and in particular, flavored products.)

214.    During an investor call on the date the agreements with JUUL were announced, however, defendant Willard was asked by an analyst: "how much of JUUL's business over the last 12 months have you concluded comes from underage consumers." Willard answered: "I think it's

hard to nail down exactly how much of the volume…could be attributed to underage use. We believe it's quite a small percentage." This was false. Altria and Willard knew through the due diligence they had conducted on JUUL that JUUL obtained a substantial portion of its business from underage use; Altria had itself attributed the youth addiction crisis to pod-based systems such as JUUL just months prior.

215.    During a February 20, 2019 earnings call for Altria's fourth fiscal quarter of 2018, Willard claimed that JUUL has taken "significant actions to address…concerns" about "continued underage use." This was false; JUUL and Altria had worked together to attempt to preserve JUUL's ability to market to youth. During the same call, in response to a question of whether JUUL sales may undermine Altria's sales of combustible cigarette, Willard characterized JUUL as a "harm reduction" opportunity, repeating JUUL's deceptive marketing that JUUL devices serve to reduce harm, when in fact, they were designed to draw in new nicotine addicts.

216.    On February 26, 2019, the Altria Defendants caused Altria to file its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018. The 2018 10-K was signed by defendants Willard, Gifford, Casteen, Devitre, Farrell, Kelly-Ennis, Kiely, McQuade, Munoz, Newman, Sakkab, and Shanks. It falsely downplayed risks relating to regulatory authorities, including the FDA, and repeated the false statements made to the FDA that Altria "reaffirm[ed] its ongoing and long-standing investment in underage tobacco prevention efforts."

217.    The Altria Defendants failed to disclose in the 2018 10-K material facts including that (i) JUUL had and continued, with Altria's direct assistance and participation, to market its addictive products to underage consumers; (ii) JUUL's products were harmful and its "SWITCH" campaign, in which Altria actively participated, depended upon consumer fraud relating to product

safety; and (iii) Altria's participation in JUUL's wrongdoing subjected it to substantial liability, which would materialize fully later in 2019.

218.    By taking responsibility for publicly defending JUUL's products, Altria transformed itself from simply an investor to a participant in two frauds: one on consumers, and another on Altria's investors. The Altria Defendants thereby exposed Altria to yet further liability for deception both to consumers and to Altria's investors for fraudulent public statements both about JUUL's underage customer base and JUUL's fraudulent marketing of its products.

## XII.    Altria Suffers Massive Losses from Its Reckless Investment into a Company Built Upon Unlawful Conduct, and Yet Further Losses Are Imminent.

219.    After the unrelenting stream of bad news throughout 2019, including regulatory enforcement, litigation, and widespread reporting of disease and death, Altria had no choice but to correct on its own books the lofty, irrational valuation of JUUL that its investment had implied.

220.    On October 31, 2019, Altria took a pre-tax impairment charge of $4.5 billion, pointing to the likelihood of FDA action to remove flavored e-vapor products from the market. Such a removal of flavored e-cigarettes would not only cause an immediate negative impact on JUUL's revenues but would also thwart JUUL's long-term strategy of ensnaring young, new consumers into nicotine addiction and into the JUUL brand.

221.    Just a couple months later, on January 3, 2020, Altria took yet another non-cash impartment, this time for $4.1 billion, which it attributed to its JUUL investment. Altria pointed to the increased number of legal cases against JUUL and Altria and the expectation of further legal cases to come.

222.    The two impairments totaled $8.6 billion, reducing the value of Altria's investment in JUUL from $12.8 billion to just $4.2 billion in little more than a year—a more than 2/3 reduction in the value of the investment, which in turn severely damaged Altria's shareholder value.

223.     JUUL's troubles following Altria's investment were no surprise. The Altria Defendants knew how this story would end because they wrote the book the first time around, having themselves pioneered the business model of illegal marketing of nicotine products to underage consumers.

224.     JUUL's downfall tracked the history of Altria's downfall, simply at a much quicker pace, but this too was entirely anticipated. The regulatory framework for severe restrictions upon harmful nicotine products, particularly those targeted to teenagers, had fully matured the first time around, and was prepared to respond much more swiftly to the threat e-cigarettes posed than it had to combustible cigarettes. Having themselves been subject to that regulatory regime, it could have been no surprise to the Altria Defendants how quickly JUUL would falter.

## XIII.   The Breaches of Fiduciary Duties

225.     The Altria Defendants breached fiduciary duties they owed to the company in three ways.

226.     First, the Altria Defendants caused Altria to make an investment in JUUL in the face of known, substantial, and imminent risks that exposed Altria to crippling reputational harm and legal liability through its investment. Altria knew from its own experience the serious risks a company faced when it depended upon marketing nicotine to youth and deceptive product claims. These risks were not merely hypothetical; the risks had already begun to materialize in the months leading up to Altria's investment. These risks made it absurd for Altria to invest in JUUL an amount that implied JUUL's value had more than doubled in the six months leading up to Altria's investment, when in fact, JUUL's business model appeared to be in immediate jeopardy given regulatory action and public backlash directed to JUUL specifically.

227.     Second, the Altria Defendants breached their fiduciary duties by causing Altria to not only invest in a company built upon illegal conduct but also to actively participate in that

wrongful conduct. The fact that Altria did not simply invest, but agreed to participate in JUUL's wrongdoing, is significant. Altria signed up to be an active participant in the marketing and distribution of a product the popularity of which was built upon illegal marketing to underage consumers and deceptive product safety claims.

228.    Third, the Altria Defendants breached their fiduciary duties to Altria by exposing Altria to substantial liability for conspiring with JUUL to engage in anticompetitive conduct, including an agreement among the two leaders in the e-cigarette market not to compete with each other and instead to provide distribution and marketing services to JUUL that would cement its market dominance.

229.    These breaches resulted in significant harm to Altria, including:

a.    Causing Altria to enter in an investment for which it dramatically overpaid (as noted above, indicating a valuation of JUUL of more than double its valuation from just five months before Altria's investment), notwithstanding information in Altria's possession showing that JUUL's business was in imminent danger of public backlash, regulation, and litigation that could cripple its value going forward;

b.    Causing Altria to enter into anticompetitive agreements with JUUL that would inevitably result in antitrust claims being brought both against Altria and JUUL;

c.    Causing Altria to participate in JUUL's unlawful marketing to minors and deceptive marketing of its product as being a harm reduction device when, in fact, as Altria knew at the time of the investment, JUUL's products were designed to draw in new nicotine addicts, not reduce the harm experienced by existing addicts;

       d.     Causing Altria to issue false and misleading statements to the investing public about the benefits of Altria's investment in JUUL, thus exposing Altria to substantial liabilities for securities fraud when the JUUL's value declined; and

       e.     Wasting Altria's corporate assets by making an improvident investment that not only overvalued JUUL but also required Altria to incur substantial debt.

## XIV.  Plaintiff Served a Pre-Suit Demand, Which the Company Ignored.

230.    On July 30, 2020, Plaintiff sent to the Altria board of directors a formal pre-suit demand under Virginia law. A copy of that demand is attached to this complaint as **Exhibit A.** In that letter, Plaintiff demanded that the Altria board take action to enforce Altria's claims against individuals who breached their fiduciary duties to Altria or otherwise violated the law in connection with Altria's investment in JUUL.

231.    Plaintiff set forth in the demand many of the same facts presented in this complaint, focusing in particular on the reckless nature of Altria's decision to invest in JUUL, given that Altria knew prior to the investment that JUUL faced substantial liability for unlawful marketing to underage consumers and for deceptive marketing of e-cigarettes as a smoking cessation device.

232.    On or about October 28, 2020, Plaintiff's counsel received a letter from an attorney for Altria's board in response to Plaintiff's demand. *See* **Exhibit B**.  As reflected therein, the Altria board has taken no action in response to the demand. It has made no investigation of any underlying claim. Instead, it took the 90-day statutory time to advise Plaintiff that it would do nothing, indefinitely, in deference to developments in other litigation.

233.    The Altria board's refusal to act violates its duties to protect the interests of Altria and to refrain from conduct that would injure the corporation. The Altria board's refusal to act was not done in an informed manner or with due care, and the Altria board offers no rational or

substantiated business purpose for its refusal to act. The board has thus failed in its fundamental duty and obligation to protect Altria as a corporate enterprise.

234.    Therefore, Plaintiff may proceed with this derivative action designed to protect the interests of Altria by pursuing Altria's claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, and related claims against the Altria Defendants and JUUL Defendants.

## COUNT I

### Against the Altria Defendants for Breach of Fiduciary Duty

235.    Plaintiff incorporates by reference and realleges each allegation contained above as through fully set forth in this count.

236.    The Altria Defendants, as Altria directors, officers, or both, owe Altria the utmost fiduciary duties of due care. By virtue of their positions of directors, officers, or both or by virtue of their exercise of control and ownership over the business and corporate affairs of Altria, the Altria Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause Altria to engage in the acts this complaint describes.

237.    The Altria Defendants breached their duty of care in connection with the JUUL agreements by, *inter alia*, (a) causing Altria to enter in an investment for which it dramatically overpaid, notwithstanding information in Altria's possession showing that JUUL's business was in imminent danger of public backlash, regulation, and litigation that could cripple its value going forward; (b) causing Altria to enter into anticompetitive agreements with JUUL that would inevitably result in antitrust claims being brought both against Altria and JUUL; (c) causing Altria to participate in JUUL's unlawful marketing to underage consumers and deceptive marketing of its product as being a harm reduction device when, in fact, as Altria knew at the time of the

62

investment, JUUL's products were designed to draw in new nicotine addicts, not reduce the harm experienced by existing addicts; (d) causing Altria to issue false and misleading statements to the investing public about the benefits of Altria's investment in JUUL, thus exposing Altria to substantial liabilities for securities fraud when the JUUL investment went south; and (e) wasting Altria's corporate assets by making an improvident investment that not only overvalued JUUL but also required Altria to incur substantial debt.

238.    As a direct and proximate result of Altria Defendants' conscious failure to perform their fiduciary duties, Altria has sustained, and will continue to sustain, significant damages, both financially and to its corporate image and goodwill.

239.    As a result of the misconduct alleged in this count, the Altria Defendants are liable to Altria.

## COUNT II

**Against the JUUL Defendants for Aiding and Abetting Breaches of Fiduciary Duty**

240.    Plaintiff incorporates by reference and realleges each allegation contained above as through fully set forth in this count.

241.    The JUUL Defendants provided substantial assistance and encouragement to the Altria Defendants, and the JUUL Defendants acted with an unlawful intent, including knowledge that the Altria Defendants were breaching their fiduciary duties and an intent to assist the Altria Defendants in breaching their fiduciary duties.

242.    As a direct and proximate result of Altria Defendants' conscious failure to perform their fiduciary duties, Altria has sustained, and will continue to sustain, significant damages, both financially and to its corporate image and goodwill.

243.    As a result of the misconduct alleged in this count, the Altria Defendants are liable to Altria.

## COUNT III

### Against the Altria Defendants for Waste of Corporate Assets

244.    Plaintiff incorporates by reference and realleges each allegation contained above as through fully set forth in this count.

245.    As a result of the wrongdoing alleged in this complaint, the Altria Defendants have caused Altria to waste its assets by overpaying for the JUUL investment, as well as by improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties and forced Altria to overpay for the investment in JUUL and to engage in other breaches of fiduciary duties alleged in this complaint.

246.    As a direct and proximate result of Altria Defendants' waste of Altria's corporate assets, Altria has sustained, and will continue to sustain, significant damages, both financially and to its corporate image and goodwill.

247.    As a result of the misconduct alleged in this count, the Altria Defendants are liable to Altria.

## COUNT IV

### Against the Altria Defendants for Unjust Enrichment

248.    Plaintiff incorporates by reference and realleges each allegation contained above as through fully set forth in this count.

249.    As a result of the wrongdoing alleged in this complaint, the Altria Defendants have been unjustly enriched by the improper compensation and bonuses to certain of its executive

officers and directors while those officers and directors where breaching their fiduciary duties as alleged in this complaint.

250.    Plaintiff seeks restitution to Altria from the Altria Defendants, including an order for the Altria Defendants to disgorge all profits, benefits, and other compensation they received from Altria from their wrongful conduct and fiduciary breaches.

251.    Plaintiff, on behalf of Altria, has no adequate remedy at law.


## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Altria, demands judgment as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Altria, and that Plaintiff is an adequate representative of Altria;

B.      Finding the Altria Defendants liable for breaching their fiduciary duties owed to Altria, and award damages to Altria for such breaches;

C.      Finding the JUUL Defendants liable for aiding and abetting the Altria Defendants' breaches of fiduciary duties, and award damages to Altria for such breaches;

D.      Finding the Altria Defendants liable for corporate waste, and award damages to Altria for such breaches;

E.      Imposing a constructive trust and awarding Altria the disgorgement of all profits obtained by the Altria Defendants as a result of the unjust enrichment described in this complaint;

F.      Directing Altria to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Altria and its shareholders from future misconduct similar to that alleged in this complaint, including putting forward for shareholder vote resolutions for amendments to the Altria's Bylaws or Articles of

Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Altria's controls over the prevention of marketing to underage consumers;

2.      a proposal to strengthen the Company's controls over its acquisitions so that its acquisition targets are not involved in unlawful conduct such as marketing to underage consumers and making deceptive product claims;

3.      a proposal to strengthen Altria's oversight of its disclosure procedures;

4.      a proposal to strengthen the Altria board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board; and

5.      a provision to permit the shareholders of Altria to nominate at least three candidates for election to the Board.

G.      Awarding Plaintiff the costs and disbursements of this action, including attorneys', accounts', and experts' fees; and

H.      Awarding such other and further relief as is just and equitable.

Respectfully submitted,

_/s/  Paul M. Falabella_
Craig J. Curwood (VSB No. 43975)
Paul M. Falabella (VSB No. 81199)
**Butler Curwood, PLC**
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Tel: 804-648-4848
Fax: 804-237-0413
Email: craig@butlercurwood.com
        paul@butlercurwood.com

Robert C. Schubert *(pro hac vice to be filed)*
Willem F. Jonckheer *(pro hac vice to be filed)*
**Schubert Jonckheer & Kolbe LLP**
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Telephone:     (415) 788-4220
Facsimile:     (415) 788-0161
Email:  rschubert@sjk.law
          wjonckheer@sjk.law


Edward F. Haber *(pro hac vice to be filed)*
Patrick J. Vallely *(pro hac vice to be filed)*
**Shapiro Haber & Urmy LLP**
Seaport East, 2 Seaport Lane
Boston, Massachusetts 02210
Telephone:     (617) 439-3939
Facsimile:     (617) 439-0134
Email:  ehaber@shulaw.com
          pvallely@shulaw.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, David Hamilton, am the plaintiff in the captioned matter. I have read the foregoing VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT and know its contents. I am informed and believe, and on that ground allege, that the matters stated therein are true and correct.

Executed on _____January 22, 2021_____, in Allentown, Pennsylvania. I declare under penalty of perjury that the foregoing is true and correct.

*David Hamilton*
David Hamilton